1  JENNIFER A. YOUNGS (*pro hac vice application*)
   Email: youngsj@sec.gov
2  100 F Street NE / Mail Stop 5631
   Washington, District of Columbia 20549-5631
3  Telephone: (202) 551-6139

4  KATHRYN C. WANNER (Cal. Bar No. 269310)
   Email: wannerk@sec.gov
5  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
6  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904

7
   Attorneys for Plaintiff
8  Securities and Exchange Commission

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>   Plaintiff,<br><br>   vs.<br><br>MICHAEL P. OWENS and ORLINA OWENS,<br><br>   Defendants. | Case No.<br><br>**COMPLAINT FOR FRAUDULENT TRANSFER AND FORECLOSURE OF EQUITABLE LIEN** |

COMES NOW Plaintiff, the United States Securities and Exchange Commission ("SEC" or the "Commission"), and for its causes of action, alleges and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1345 (United States as plaintiff), 28 U.S.C. § 1355 (fine, penalty or forfeiture), 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 3301, *et seq*. (FDCPA fraudulent transfers), and under the doctrine of ancillary jurisdiction allowing enforcement jurisdiction over a judgment creditor's fraudulent conveyance claims against transferees who were not parties to the underlying action. Further, Owens's judgment provides in paragraph VII that " . . . this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment."

2. The Central District of California is the proper venue for this proceeding pursuant to 28 U.S.C. § 1391 because the events giving rise to the SEC's claims occurred in this district and because this action is an ancillary proceeding to the SEC Litigation. In addition, venue is proper in this district because all of the Defendants reside in this district.

3. Defendant Michael P. Owens is an individual and resident of the State of California who maintains a residence in Newport Beach, California 92660. Defendant Orlina Owens is an individual and resident of the State of California who maintains a residence in Newport Beach, California 92660.

## INTRODUCTION AND SUMMARY

4. This matter involves a campaign of asset concealment and fraudulent transfers employed by Defendant Michael P. Owens ("Owens") and his former wife, Orlina Owens ("Mrs. Owens") with the intent to hinder, delay, and defraud the Owenses' creditors, including the SEC.

5. The SEC brought suit against Owens in the United States District Court for the Central District of California in Case Number 8:21-cv-01427-PD on August 31, 2021 (the "SEC Litigation").

1

6. In the SEC Litigation, the Commission alleged that Owens engaged in securities fraud, the offer and sale of unregistered securities, and acted as an unregistered broker-dealer in violation of Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act"), and Sections 15(a)(1) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(a) and 10b-5(c) thereunder.

7. On September 20, 2024, following a ten-day trial, a jury found Owens liable on all counts of the Complaint. On November 1, 2024, the SEC requested the court enter a judgment including $10,643,495.00 in disgorgement, together with prejudgment interest in the amount of $4,029,319.00, and a civil penalty in the amount of $1,312,320.00, totaling $15,985,134.00 in monetary relief.

8. On April 24, 2025, the Court entered its Final Judgment against Owens, ordering him to pay a civil penalty of $184,767.00 "(Penalty") and to disgorge $10,111,320.20 in ill-gotten gains received by him, plus prejudgment interest thereon in the amount of $3,827,853.05 (disgorgement and prejudgment interest hereinafter collectively referred to as the "Disgorgement Amount"), for a judgment totaling $14,123,940.20. After entry of the Final Judgment, the SEC made a demand for payment on Owens by letter dated May 7, 2025. To date, the only funds collected from Owens are from accounts frozen in the underlying action for a total of $1,117.50. Post-judgment interest continues to accrue on the judgment pursuant to 28 U.S.C. § 1961.

9. Between the September 20, 2024 jury verdict and the entry of the April 2025 Final Judgment, the Owenses filed for divorce. They entered into a Marital Settlement Agreement ("MSA") on December 19, 2024, one day prior to the remedies hearing on the SEC's request to enter a judgment in the total amount of $15,985,134.00 against Owens. The MSA transferred to Mrs. Owens the vast majority of the assets in the marital estate. This includes Owens's interest in their marital residence located at 18 Ronsard in Newport Coast, California ("Ronsard Property"), which he quitclaimed to Mrs. Owens.

10. On or about September 26, 2024, six days after the jury verdict, Owens and

1  Mrs. Owens listed the Ronsard Property for sale with a listing price of $6.25 million. The property ultimately sold for $6,000,000 on April 11, 2025.

11. Between the time Owens became aware of the SEC's pre-filing investigation and the entry of the final judgment in the SEC Litigation, Owens and Mrs. Owens took steps to transfer substantially all of the parties' marital assets to a purported private retirement plan and to Mrs. Owens through the MSA. These transfers left Mr. Owens in a position where he describes himself as "destitute."

12. At all relevant times, upon information and belief, both Owens and Mrs. Owens knew of the pending SEC action, the subsequent jury verdict, and the SEC's pending motion requesting that the court enter a judgment including $10,643,495.00 in disgorgement, together with prejudgment interest in the amount of $4,029,319.00 and a civil penalty in the amount of $1,312,320.00, totaling $15,985,134.00 in monetary relief.

13. As of the date of the filing of this Complaint, more than $14.2 million remains outstanding and unpaid on the SEC judgment.

14. Pursuant to the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001, *et seq.*, and the California Uniform Voidable Transactions Act ("UVTA"), California Civil Code §§ 3439 *et seq*. (formerly known as the Uniform Fraudulent Transfer Act ("UFTA")), the SEC seeks through this action to: (a) reverse the fraudulent transfers of assets from the Owenses' marital estate to Mrs. Owens; (b) require both Owens and Mrs. Owens to turn over the assets from the marital estate to the SEC to be applied to the outstanding judgment, whether those assets have been transferred to third parties, trusts, or to foreign accounts or investments; and (c) obtain a money judgment against Mrs. Owens for the value of the fraudulently transferred assets, and for such further relief as set forth below.

## FACTUAL ALLEGATIONS

### I. OWENS HAS BEEN THE SUBJECT OF VARIOUS SEC INVESTIGATIONS SINCE 2007

15. In 2007, the SEC charged Owens with perpetrating a $50 million offering

fraud and running a boiler room in a matter titled *SEC v. Real Estate Partners, Inc. et al.*, Case No. SACV 07-1022 AG (RNBx) (C.D. Cal., filed Sept. 6, 2007) (the "Real Estate Partners Litigation").

16. Owens settled the Real Estate Partners Litigation in 2009 via a consent judgment in which he neither admitted nor denied the truth of the assertions in the complaint against him.

17. In 2009, the Commission subsequently barred Owens from associating with a broker or dealer in an action titled *In the Matter of Michael P. Owens*, AP File No. 3-13472 (May 19, 2009).

18. On May 2, 2018, the Commission sent a subpoena to Owens for documents and testimony in connection with a new investigation titled *In the Matter of Elite Aerospace Group, Inc.*

19. The Commission's May 2, 2018 subpoena to Owens requested that he personally produce the requested documents to the Commission by May 16, 2018 and appear for testimony on June 7 and 8, 2018.

20. Among other topics, the Commission's May 2, 2018 subpoena requested that Owens produce documents related to Elite Aerospace Group, Inc. ("Elite"), the solicitation of investors in Elite, and Owens's relationship with Elite.

21. Because Owens had previously had an SEC action brought against him, he was familiar with the process and was put on notice of the relief the SEC would seek against him for his violations of the securities laws in connection with his involvement with the sale of Elite's securities.

22. On or about May 2, 2018 the Commission also sent investigative subpoenas to Evolution Consulting, Inc., Real Media Marketing, Inc., and 6 Degrees, Inc. All of these companies were affiliated with Owens.

23. On or about July 24, 2018, Owens personally appeared for investigative testimony in connection with the Commission's investigation. During that investigative testimony, under penalty of perjury, and with counsel present, Owens asserted his Fifth

Amendment privilege against self-incrimination and would not testify on a variety of topics, including but not limited to the following:

    a.     his companies, Evolution Consulting, Inc., Six Degrees Services, Inc., and Real Media Marketing, Inc.;

    b.     whether Evolution Consulting, Inc. was the entity responsible for Elite's investor solicitation;

    c.     whether he advised Elite's officers and directors and whether he attended Elite's board of director meetings;

    d.     whether he controlled Elite's investor funds;

    e.     whether Elite investor funds paid him or any of his companies; and

    f.     what he had discussed about the Commission's investigation with Dawson Davenport, Robert Gunton, and Andrea Lindstrom.

## II. OWENS BEGAN ENGAGING IN ASSET PROTECTION STRATEGIES DAYS AFTER THE SEC SUBPOENAED HIM

24. According to the declaration of Jeffrey M. Verdon, in May 2018, days after the SEC issued its investigative subpoena to Owens, Owens hired The Jeffrey M. Verdon Law Group, LLP ("VLG") to create a private retirement plan ("PRP") pursuant to California Code of Civil Procedure Section 704.115.[1]

25. As set forth in the declaration of Jeffrey Verdon, the purpose of the PRP was to "hold title to certain assets for the settlors and their children and descendants and protected from future *unknown and unforeseeable* legal claims. At the time the PRP was

---

[1] A California PRP is, at its core, a retirement plan. At a minimum, it should have a trust that is created and funded by the employer (a "Private Retirement Trust") and the PRP is required to be designed and used *for retirement purposes*. Only California residents may utilize a PRP. It works for small, wholly owned businesses, unlike some other retirement plans. "The key consideration is that there be a "plan", which means that there should be a funding schedule for the plan, and a payout schedule for the plan, both based on some solid actuarial calculation for the retiree's needs. If somebody thinks that they can just chunk a bunch of assets into a "plan" and think those assets will be exempt, they are wrong. [T]hese plans really anticipate that there will be a level, periodic funding of some part of the employee's earnings . . ." See Jay Adkisson, *The California Private Retirement Plan: Separating Fact from Fiction*, FORBES, Dec. 18, 2015.

created and funded, VLG was *unaware of any present, expected or foreseeable claims against the Sponsor nor Mr. Owens that would have prevented the implementation of the PRP under California applicable fraudulent transfer laws.*" (emphasis added).

26. The "sponsor" of the PRP would be PowerSource Products, LLC.

27. Owens was the Managing Member of PowerSource Products, LLC, a Delaware limited liability company with its alleged principal place of business in Costa Mesa, California. Upon information and belief, PowerSource Products, LLC, was a shell company from which Owens never made any money.

28. Two months later, in early July of 2018, Owens met with Raymond Olmo, the founder and Chief Executive Officer of Private Retirement Plan Administrators, LLC dba Trust CFO regarding the creation of a PRP. Trust CFO was a third-party plan administrator hired to perform certain administrative services related to the PRP being created by VLG.

29. According to the declaration of Raymond Olmo, during this July of 2018 meeting with Mr. Olmo, Owens did not disclose the SEC's investigation into him in connection with the sale of Elite's securities.

30. As set forth in a declaration by Raymond Olmo, if Owens had disclosed the SEC's investigation to him in connection with the sale of Elite's securities, Mr. Olmo would not have recommended that Owens create a PRP.

31. On July 12, 2018, Owens signed an Affidavit of Solvency under oath and provided it to VLG in connection with the creation of the PRP. In it, he knowingly attested to several statements that were false or misleading including, but not limited to:

    a. that to his knowledge he was not nor did he reasonably expect to be, under investigation by any federal or state agency, including the SEC, however, not only had the SEC already issued its subpoena to Owens at that time, but less than two weeks later, on July 24, 2018, Owens appeared for testimony under oath in response to the SEC's subpoena;

      b.    that his company Evolution Consulting had been subpoenaed for the production of documents by the SEC, but failing to disclose that he had also been subpoenaed personally for documents and testimony;

      c.    that since 2009 he had not participated in selling any securities, which is false because the federal jury in the SEC Litigation determined that he was liable for securities fraud between 2014 and 2018 in connection with the purchase or sale of a security and liable under Section 5 of the Securities Act for the offer or sale of unregistered securities; and

      d.    that the work his company Evolution did for EAG only concerned compliance and media matters when in reality, Evolution, and its predecessor Real Media Marketing, Inc., actually provided a plug and play fundraising solution to companies seeking to raise capital through the sale of securities.

32. On or about September 10, 2018, the PowerSource Products Private Retirement Plan ("PowerSource PRP") was created.

33. The PowerSource PRP, according to the plan documents, was intended to provide a vehicle for Owens to save for retirement "by making periodic contributions of after-tax compensation, periodic contributions of an allocable share of profits taxable to [Owens], and/or purchasing Sponsor stock held by [Owens], and contributions of assets 'in kind' to the Plan."

34. In reality, Owens never made periodic contributions of after-tax compensation to the PowerSource PRP.

35. Upon information and belief, Owens instead intended that the PowerSource PRP be used to shelter the equity he held in his primary residence from creditors, including the SEC.

36. On or about September 10, 2018, nearly two months after his sworn testimony to the SEC, the 1073OWEMIC Retirement Trust ("the Trust") was created as

part of Owens' PowerSource PRP.

37. The Trust was created by and between Owens and PowerSource Products, LLC as the trust's sponsor.

38. Owens was the only participant in the Trust.

39. Under the express terms of the Trust at Section 3.1(G)(1), Owens could not transfer "personal use property" into the trust.

40. No funds were contributed to the PowerSource PRP by any employer of, or company owned by, Owens, including PowerSource Products, LLC.

41. Instead, Owens contributed a promissory note secured by a $2,887,325.00 deed of trust on the Ronsard Property to the Trust.

42. The deed of trust securing the Trust promissory note by the Ronsard Property was signed on November 30, 2018, more than four months after his testimony before the SEC where Owens invoked his Fifth Amendment privilege against self-incrimination. The deed of trust was recorded by the Orange County Clerk on January 18, 2019.

43. A second "contribution" to the Trust for $144,000 was made in 2024, again in the form of a promissory note secured by a deed of trust on the Ronsard Property. Upon information and belief, this deed of trust was never recorded.

44. From 2019 through 2025, Owens was supposed to fund the Trust with interest payments on the 2018 promissory note in the amount of 4% (or $115,493.00) per year, for a total of $808,451.00. Owens never made any of these interest payments.

45. In 2024, Owens was supposed to fund the Trust with an additional interest payment on the second promissory note of $7,200.00. Owens never made this interest payment.

46. Upon information and belief, Owens has used the PowerSource PRP and the related Trust as an asset protection mechanism rather than a retirement plan. Although the Trust satisfies the California PRP requirement to have a trust, the Trust was not created or funded by an employer. Furthermore, the funding and payout

schedules for the Trust, to the extent that any exist, appear to have no basis in Owens's retirement needs.

### III. THE MAJORITY OF OWENS' MARITAL ESTATE, INCLUDING THE RONSARD PROPERTY, WAS FRAUDULENTLY TRANSFERRED TO MRS. OWENS BETWEEN THE JURY VERDICT AND ENTRY OF JUDGMENT AGAINST OWENS

47. On September 25, 2024, five days after the September 20, 2024 jury verdict against Owens, Mrs. Owens signed a Petition for Dissolution of her marriage with Owens ("Petition for Dissolution"), which was filed in the Orange County Superior Court in case number 24D007188.

48. On December 19, 2024, one day before the remedies hearing that would, in part, determine if a judgment in the total amount of $15,985,134 would be entered against Owens in the SEC Litigation, Owens and Mrs. Owens signed the MSA purporting to divide their marital assets.

**A.   The Owenses Agreed to Have Mrs. Owens Retain or Gain Ownership and Control of Most of Their Personal Property and a Luxury RV Lot in Nevada through the MSA**

49. The MSA was a negotiated contract between Owens and Mrs. Owens that outlined the division of their marital property. The terms and conditions therein were not determined by a judge, mediator, or arbitrator. They provided that Mrs. Owens would receive the majority of the couple's disclosed assets upon divorce, including, but not limited to:

    a.    bank accounts worth at least $502,740.91;

    b.    payment of $1,344,703.84 in cash from the Ronsard Property sales proceeds, which was transferred to accounts not listed in the MSA for the benefit of Mrs. Owens on or about April 11, 2025 (the "Ronsard Transaction");

    c.    the right to demand $2,959,825.00 from the Trust;

9

   d. a luxury RV lot in Las Vegas, Nevada ("Las Vegas Property"), that was purchased in May of 2021 using community property funds for $119,500.00 and titled in the names of Mrs. Owens and a business she purports to own called Orlina's Events; and

   e. three vehicles, two additional businesses Mrs. Owens purports to own, and various furniture, art and personal effects, the valuation of which is uncertain.

### B. The Owenses Agreed to Have Owens Retain or Gain Ownership and Control of Virtually None of Their Personal Property through the MSA

50. According to Owens, the MSA allocated assets to him valued at $200,000.

51. While bank accounts worth $502,740.91 were apportioned to Mrs. Owens, the bank accounts in which Owens was to retain an interest were valued at only $128,630.07 on or about April 14, 2025.

52. Owens is to retain his interest in a November 2022 judgment against the defendants in *Michael P. Owens v. Dustin Tillman and Zeeshawn Zi*a, Orange County Superior Court, 16 Case No. 30-2020-01152100-CU-CO-NJC; however, upon information and belief, Owens has collected nothing on the judgment.

53. The MSA also allocated to Owens certain businesses, including "Launch Media"; however, their valuation is questionable, and, upon information and belief, the companies likely have minimal to no value.

54. Owens also retained his interest in two vehicles, personal effects and belongings, the valuation of which is uncertain.

55. It appears that the MSA divided the Owenses' marital assets so that Mrs. Owens has a net worth of several million dollars while Owens was left with approximately $200,000. Mrs. Owens provided no offset of assets of equivalent value to explain why she received the majority of the Owenses' marital property.

56. After agreeing to relinquish his interest in the most valuable marital assets,

Owens now claims he is insolvent and would be homeless without the assistance of Mrs. Owens.

### C. The Owenses Agreed to Transfer the Most Valuable Marital Asset Disclosed to Date, the Ronsard Property, to Mrs. Owens in Her Sole Capacity

57. On September 26, 2024, Owens and Mrs. Owens listed the Ronsard Property for sale for $6,250,000. This date was six days after the September 20, 2024 jury verdict against Owens and only one day after the Mrs. Owens filed the Petition of Dissolution.

58. On December 19, 2024, one day before the remedies hearing that would, in part, determine the monetary amounts Owens would be liable for in the SEC Litigation but more than one month after the SEC requested the court enter a judgment against Owens totaling $15,985,134.00, Owens executed a quitclaim deed assigning his interest in the Ronsard Property to his soon-to-be ex-wife Mrs. Owens. The quitclaim deed was not recorded on the Ronsard Property's title until January 27, 2025. Thereafter, the Ronsard Property was titled to only Mrs. Owens in her individual capacity.

59. On or about March 21, 2025, the SEC obtained a copy of the MSA. Because the agreement divested Owens from his interest in the Ronsard and Las Vegas Properties, the SEC provided notice to John van Loben Sels ("van Loben Sels") and Brittany Nobles ("Nobles"), Owens's counsel, that the SEC was seeking to file a Notice of Lis Pendens against the two properties on March 26, 2025.

60. On April 9, 2025, after communicating with van Loben Sels and Nobles, the SEC provided notice to van Loben Sels and Nobles that the SEC would seek an asset freeze for the assets identified in the MSA, rather than recording the proposed Notices of Lis Pendens. A hearing date of April 14, 2025, at 1:30 p.m., was set on the SEC's motion for an asset freeze.

61. According to the original sales contract for the sale of the Ronsard Property, the sale was scheduled to close on April 17, 2025. Conveniently, however, the sale of

the Ronsard Property was expedited by a week by Mrs. Owens unbeknownst to the SEC. The Ronsard Property was instead sold on Friday, April 11, 2025, with the proceeds of the sale being distributed to Mrs. Owens and other third parties.

62. Mrs. Owens received a wire of $1,344,703.84 on April 14, 2025 at 12:57 p.m., thirty-three minutes prior to the commencement of the hearing on the SEC's motion to freeze assets, including the Ronsard Property or the proceeds from its sale.

## IV. DESPITE THE PETITION FOR DISSOLUTION AND THE MSA, OWENS CONTINUES TO SHARE A HOME AND FINANCES WITH MRS. OWENS

63. Since the date of the jury verdict against Owens in the SEC litigation and the subsequent divorce filing, Owens has continued to live with Mrs. Owens except for a brief period where Owens lived in a hotel in advance of the hearing on the SEC's motion for a preliminary injunction.

64. Upon information and belief, Owens and Mrs. Owens currently live together at a $10,000/month rental home for which both Owens and Mrs. Owens signed the lease on March 28, 2025, more than six months after the September 25, 2024 filing for divorce.

65. In addition, after the sale of the Ronsard Property and from proceeds from that sale, Mrs. Owens paid Owens's legal retainer.

66. Upon information and belief Owens has not been employed for more than one year and has no known source of income.

67. Upon information and belief, Mrs. Owens no longer operates Orlina's Events, LLC. She currently generates income only from event planning, singing and making artwork and furniture from musical instruments. During the parties' marriage, Mrs. Owens never generated more than minor income from employment or business operations, insufficient to support herself or the couple.

///
///

12

# COUNT I

## 28 U.S.C. § 3304 (b)(1)(A)

### **Transfers With Intent to Hinder, Delay, or Defraud a Creditor**

### **(Against Michael Owens and Orlina Owens)**

68. Plaintiff hereby incorporates and realleges paragraphs 1 through 67 as if fully set forth herein.

69. The transfers relating to the Ronsard Property and other marital assets that divested Owens from his interest in such property including, but not limited to, the transfer of equity to the Trust, transfer of Trust funds and other assets set forth in the MSA, and the quitclaim deed to Mrs. Owens were made with the actual intent to hinder, delay, or defraud creditors, including, but not limited to the SEC.

70. With respect to the fraudulent transfers described above, the following badges of fraud are applicable and are to be considered in determining actual intent:

    a. The transfers were made to insiders – Owens's own personal retirement trust and to Owens's then-wife;

    b. Owens retained possession and/or control of the Trust and has continued to benefit from the Ronsard Property and its subsequent sale proceeds, as well as other assets transferred in the MSA;

    c. The transfers were concealed by Owens and Mrs. Owens;

    d. Before the transfers were made, Owens was under investigation and was then sued by the SEC;

    e. The transfers of the Ronsard Property and the remaining property in the MSA were substantially all of Owens's assets;

    f. Owens was insolvent or became insolvent shortly after the transfers were made;

    g. The transfer of equity in the Ronsard Property was made after the SEC's investigation of Owens was known to him and to Mrs. Owens; and

h. The transfer of the Ronsard Property and transfers of assets through the MSA occurred after a finding of liability to the SEC, after the SEC moved the Court to enter a judgment against Owens in the total amount of $15,985,134.00, and shortly before the Final Judgment in favor of the SEC was entered and with full knowledge of the impending entry of that judgment.

## COUNT II
## 28 U.S.C. § 3304(b)(1)(B)(ii)
**Transfers for Less than Equivalent Value**
**With Awareness of Impending Inability to Pay Debts**
**(Against Michael Owens)**

71. Plaintiff hereby incorporates and realleges paragraphs 1 through 70 as if fully set forth herein.

72. Owens transferred the equity in the Ronsard Property to the Trust.

73. Owens transferred the Ronsard Property, the Las Vegas Property, bank accounts, cars and other assets to Mrs. Owens pursuant to the MSA.

74. These transfers were made by Owens without receiving a reasonably equivalent value in exchange and Owens intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

## COUNT III
## California Civil Code § 3439.04(a)(1)
**Transfers With Intent to Hinder, Delay, or Defraud a Creditor**
**(Against Michael Owens and Orlina Owens)**

75. Plaintiff hereby incorporates and realleges paragraphs 1 through 74 as if fully set forth herein.

76. Each of the transfers described in paragraphs 68 through 74 above (and the factual allegations made in support) were made by Owens with actual intent to hinder,

delay, or defraud one or more of his creditors, including the SEC.

77. With respect to each of the transfers, the following "badges of fraud," among others, are applicable and are to be considered in determining actual intent:

a. The transfers were made to insiders – Owens's own personal retirement trust and to Owens's then-wife;

b. Owens retained possession and/or control of the Trust and has continued to benefit from the Ronsard Property and its subsequent sale proceeds, as well as other assets transferred in the MSA;

c. The transfers were concealed by Owens and Mrs. Owens;

d. Before the transfers were made, Owens was under investigation and was then sued by the SEC;

e. The transfers of the Ronsard Property and the remaining property in the MSA were substantially all of Owens's assets;

f. Owens received no reasonably equivalent value for the transferred assets;

g. Owens was insolvent or became insolvent shortly after the transfers were made; and

h. The transfer of the Ronsard Property and transfers of assets through the MSA were made by Owens and Mrs. Owens and occurred after a finding of liability to the SEC, after the SEC moved the Court to enter a judgment against Owens in the total amount of $15,985,134.00, and shortly before the Final Judgment in favor of the SEC was entered and with full knowledge of the impending entry of that judgment.

///
///
///
///
///

## COUNT IV

### California Civil Code § 3439.04(a)(2)

### Transfers for Less than Equivalent Value

### With Awareness of Impending Inability to Pay Debts

### (Against Michael Owens)

78. Plaintiff hereby incorporates and realleges paragraphs 1 through 77 as if fully set forth herein.

79. Without receiving a reasonably equivalent value in exchange for the transfers as set forth above in paragraphs 68 through 74 above (and the factual allegations made in support), Owens intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

## COUNT V

### California Civil Code § 3439.05

### Transfers for Less than Equivalent Value While Insolvent

### (Against Michael Owens and Orlina Owens)

80. Plaintiff hereby incorporates and realleges paragraphs 1 through 79 as if fully set forth herein.

81. Owens made the transfers as set forth above in paragraphs 68 through 74 above (and the factual allegations made in support) without receiving a reasonably equivalent value in exchange for the transfers.

82. Owens was insolvent at the time of the transfers or became insolvent as a result of the transfers.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby petitions this Court for an Order providing for:

A. Pursuant to 28 U.S.C § 3306(a)(1), the avoidance of the fraudulent transfers to the extent necessary to satisfy the civil penalty award entered against Owens in the Final Judgment;

B. Pursuant to 28 U.S.C. § 3306(a)(2), attachment of all property in the

possession, custody, or control of Mrs. Owens and in which she has a substantial non-exempt interest, up to the value of the assets transferred to and/or for her benefit, not to exceed the penalty awarded to the SEC in the Final Judgment;

C. Pursuant to 28 U.S.C. § 3306(a)(2), garnishment of bank and/or securities accounts maintained by Mrs. Owens up to the value of the assets transferred to and/or for her benefit, not to exceed the civil penalty awarded to the SEC in the Final Judgment;

D. Pursuant to 28 U.S.C. § 3306(a)(3), any other relief the circumstances may require;

E. Pursuant to 28 U.S.C. § 3307(b), a money judgment against Mrs. Owens in an amount equal to the value of all assets fraudulently transferred to her by Owens, to the extent necessary to satisfy the civil penalty award entered against Owens in the Final Judgment. In accordance with 28 U.S.C. § 3307(c), the value of such assets transferred, and therefore the amount of the money judgment, should be the value of the assets at the time of the respective transfers, subject to adjustment as the equities may require;

F. Pursuant to California Civil Code § 3439.07(a)(1), avoidance of the transfers to the extent necessary to satisfy the disgorgement debt set forth in the Final Judgment, including prejudgment interest;

G. Pursuant to California Civil Code § 3439.07(a)(2), an attachment or other provisional remedy against the assets transferred or other property of Mrs. Owens as available under applicable law;

H. Pursuant to California Civil Code § 3439.07(a)(3)(A), an injunction against further disposition by Owens or Mrs. Owens, or both, of the assets transferred or other property of Owens and/or Mrs. Owens;

I. Pursuant to California Civil Code § 3439.07(a)(3)(C), any other relief the circumstance may require;

J. Pursuant to California Civil Code § 3439.07(b), attachment of the transferred assets or other property of Mrs. Owens where the remedy of attachment is

available under applicable law;

K. Pursuant to California Civil Code § 3439.07(c), a levy on the assets transferred or their proceeds; and

L. Pursuant to 28 U.S.C. § 2201, a declaration that the Las Vegas Property is subject to an equitable lien in favor of the SEC in an amount sufficient to satisfy the disgorgement award and, therefore, that this real property may be sold pursuant to 28 U.S.C. §§ 2001 and 2002, with the proceeds to be paid to mortgagees, lienholders, and other allowed claimants in the amounts and order of priority as established by this Court through summary proceedings in the instant action; and

M. Any other relief as provided by law and as the circumstances may require.

DATED: July 14, 2025      Respectfully submitted,

              */s/ Kathryn C. Wanner*
              Kathryn C. Wanner
              Counsel for Plaintiff
              Securities and Exchange Commission